

MJC/JKM2011R00645

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

2012 SEP 14 P 1:59

**UNITED STATES OF AMERICA**

CLERK'S OFFICE
AT BALTIMORE

            :     **Criminal No.** WDQ-12-0494

**v.**        BY____:

DEPUTY

            :     **(Conspiracy to Commit Wire Fraud,)**

**DOUGLAS ALLAN KUBER,**    :     **18 U.S.C. § 1349; Forfeiture, 18 U.S.C**

            :     **§ 982(a)(2)(A))**

     **Defendant.**      :

...oOo...

**INFORMATION**

**COUNT ONE**

The United States Attorney for the District of Maryland charges that:

**Introduction**

1.    At all times relevant to this Information, the defendant, **DOUGLAS ALLAN**

**KUBER** ("**KUBER**"), and J.E.R. were members, owners, and operators of Account Receivable

Services, LLC ("ARS"), a Nevada limited liability company. ARS's principal office was located

at 110 Greene Street, New York, New York. ARS was primarily in the business of investing in

medical accounts receivable using funds borrowed from other investors.

2.    At all times relevant to this Information, R.E.S was a shareholder and officer of

International Portfolio, Inc. ("IPI"), a Delaware company. IPI's principal office was located at 200

Barr Harbor Drive, Suite 400, West Conshohocken, Pennsylvania. IPI was primarily involved in

the business of buying, selling, and managing medical accounts receivable.

3.      At all times relevant to this Information, R.M.F., through his company, Delaware

Valley Consulting, Inc. ("DVC"), was a consultant and business partner with R.E.S and IPI.  DVC

was a Pennsylvania company with its principal office located at 229 Righters Mill Road, Gladwyne,

Pennsylvania.

4.      At all times relevant to this Information, Platinum Partners ("Platinum") was a hedge

fund in the business of investing in high-yield investments and financial intsruments, including

fixed-rate notes secured by medical accounts receivable.  Platinum had its principal office in New

York, New York.  Limited liability companies and partnerships affiliated with Platinum were

Platinum Credit Resources, LLC; Platinum Partners Value Arbitrage Fund, L.P. ("Platinum

Partners"); Centurion Credit Resources, LLC ("Centurion"); Level 3 Capital Fund, LP ("Level 3");

and Titanium Capital Partners, LLC ("Titanium").

5.      At all times relevant to this Information, the International Institute of Tropical

Agriculture ("IITA"), a non-governmental philanthropic organization, managed foreign aid and

conducted research to develop solutions for hunger and poverty in Africa.  IITA had its principal

office in Ibadan, Oyo State, Nigeria.

6.      At all times relevant to this Information, a Trustee of IITA, hereinafter "D.L.," lived

and worked in West River, Maryland.

**The Scheme and Artifice to Defraud**

7.      From in or about March 2007 until in or about September 2011, in the District of

Maryland and elsewhere, **DOUGLAS ALLAN KUBER**, J.E.R., R.E.S., and R.M.F. knowingly

2

devised and intended to devise a scheme and artifice to defraud investors who financed the purchase of medical accounts receivable and to obtain money and property from such investors in excess of $145 million by means of materially false and fraudulent pretenses, representations, and promises ("the scheme to defraud").

### The Conspiracy to Execute the Scheme to Defraud

8.      From in or about March 2007 until in or about September 2011, in the State and District of Maryland and elsewhere,

### DOUGLAS ALLAN KUBER,

the defendant herein, did knowingly and willfully conspire, combine, confederate, and agree with J.E.R., R.E.S., and R.M.F. to commit wire fraud, in violation of Title 18, United States Code, Section 1343, to wit, to knowingly execute and attempt to execute the scheme to defraud, in which it was reasonably foreseeable that, for the purpose of executing the scheme to defraud, certain writings, signs, signals, or sounds would be transmitted or caused to be transmitted in interstate and foreign commerce by means of wire communications ("the conspiracy to defraud").

### Objects of the Conspiracy to Defraud

9.      The objects of the conspiracy to defraud were to make material, false and fraudulent representations to persuade investors to participate in investment opportunities involving ARS's use of high interest, fixed-rate loans to purchase medical accounts receivable from IPI in order that:

(a)      KUBER and J.E.R., through ARS and affiliated companies, would obtain undisclosed up-front fees and commissions from the proceeds of the loans in the form of kickbacks from IPI; and

3

(b)      R.E.S and R.M.F., through IPI and DVC, would obtain money from the sale of IPI's medical accounts receivable to ARS, as well as management fees for administering the collections of those accounts receivable.

**Manner and Means**

10.      It was part of the conspiracy to defraud that **KUBER**, J.E.R., R.E.S., and R.M.F. devised and promoted an investment scheme involving aggregated medical accounts receivable called debt portfolios by falsely representing to investors that ARS calculated the purchase price and anticipated rates of collection and liquidation for the debt portfolios using a licensed proprietary methodology. In truth and fact, no such methodology was employed.

11.      It was part of the conspiracy to defraud that **KUBER**, J.E.R., R.E.S., and R.M.F. falsely represented to investors that the money the investors loaned ARS would be used by ARS for the sole purpose of financing ARS's purchase of the debt portfolios from IPI and that neither ARS nor KUBER and J.E.R. would receive any money from the investment offerings until the principal and interest on the investors' loans were paid in full. In truth and fact, ARS and IPI had a pre-loan transactional fee arrangement whereby at least five percent (5%) of each loan's principal was set aside as a kickback from IPI to ARS for facilitating the investment transaction. The kickbacks were payable to ARS upon IPI's receipt of the investors' funds, which IPI then transferred to bank accounts designated by **KUBER** and J.E.R. **KUBER**, J.E.R, R.E.S., and R.M.F. used the cover of a buyback provision in their purchase agreements called "Purchase Price Adjustment" to falsely label the kickbacks as refunds and rebates purportedly due ARS for the receipt of unqualified accounts receivable.

4

12.     It was part of the conspiracy to defraud that the rates of collection and liquidation of the debt portfolios were purposely inflated by falsely representing loans and advances from IPI to ARS as successful collections on unliquidated accounts receivable.

**Overt Acts**

In furtherance of the conspiracy and scheme to defraud, and to effect the objects thereof, the defendants committed the following overt acts in the District of Maryland and elsewhere:

13.     On or about November 19, 2007, R.E.S. sent an email to **KUBER** acknowledging the receipt of $1.7 million for the purchase of debt portfolios and requesting information on where to wire the 5% kickback of $85,000, which R.E.S. referred to as a return of funds for non-qualified accounts.

14.     On or about November 19, 2007, **KUBER** responded to the foregoing email from R.E.S. asking him not to state in the wire transfer the reason for the $85,000 payment.

15.     On or about March 13, 2008, R.E.S. wired or cause to be wired $7,858,797.50 to DVC, which was R.M.F.'s share of the proceeds from the sale of a portfolio to ARS Portfolio One, LLC, which was financed by a fixed-rate loan from Platinum Partners and Centurion.

16.     On or about March 13, 2008, R.E.S. deposited or caused to be deposited into his personal account $8,058,797.50, which was his share of the proceeds from the sale of a portfolio to ARS Portfolio One, LLC, which was financed by a fixed-rate loan from Platinum Partners and Centurion.

17.     On or about March 23, 2008, **KUBER** emailed instructions to R.E.S. to wire a 5% kickback as an "Advisory Fee" to a company affiliated with ARS.

18. On or about September 16, 2008, **KUBER** emailed portfolio collection reports to D.L., a trustee of IITA, which represented funds received from IPI as collections, thereby inflating the collection totals.

19. On or about September 17, 2008, **KUBER** sent an email to D.L., an IITA trustee searching for investment opportunities for IITA. Attached to the email, was a summary of ARS's investment proposal to IITA, which falsely represented that:

(a) any money IITA agreed to lend to ARS would be deposited into a restricted bank account and be "secured by the portfolios of hospital receivables purchased with the financing proceeds . . ." and ARS would not "receive any funds from the restricted account unless either the Note is paid in full or, upon the sale of the portfolio, there are more funds in the account than are needed to pay in full all the principal and interest due"; and

(b) ARS utilized a "proprietary licensed methodology" called "Portfolio Scope" to predict liquidation rates generated from both the collection and ultimate resale of the portfolios of hospital receivables.

20. On or about October 14, 2008, J.E.R. sent an email to **KUBER** advising that R.M.F. wanted assurances that Platinum would continue to finance ARS's purchase of debt portfolios provided by IPI.

21. On or about November 9, 2008, **KUBER** sent an email to J.E.R. with the subject line "Rebate" requesting that IPI send a 5% kickback of $724,998.81 in two wire transfers, both labeled "Consulting."

6

22.     On or about November 10, 2008, R.E.S. wired or caused to be wired $6,675,000 to the business bank account of DVC, which represented R.M.F.'s share of $14.5 million IPI received from the sale of debt portfolios to ARS Portfolio Thirteen, LLC, ARS Portfolio Fourteen, LLC, and ARS Portfolio Fifteen, LLC, that were financed by IITA, Level 3, and Centurion, respectively.

23.     On or about November 10, 2008, R.E.S. wired or caused to be wired $6,675,000 to the business bank account of R.E.S., which represented his share of $14.5 million IPI received from the sale of debt portfolios to ARS Portfolio Thirteen, LLC, ARS Portfolio Fourteen, LLC, and ARS Portfolio Fifteen, LLC, that were financed by IITA, Level 3, and Centurion, respectively.

24.     On or about March 10, 2009, **KUBER** sent an email to a representative of IITA claiming that a new debt portfolio had been purchased with "funds generated from the collections on the existing debt portfolios," when, in fact, a new portfolio was purchased with funds advanced by IPI.

25.     On or about April 16, 2009, **KUBER** sent an email to a representative of IITA with the subject line "Collections to Date," in which he again falsely represented that a portfolio, which was worth more than $2,000,000, had been purchased with the proceeds from collections and portfolio resales.

26.     On or about October 3, 2010, **KUBER** sent an email to D.L., a trustee of IITA, with the subject line "Report to Board of Directors of IITA," in which he falsely claimed that the accounts receivable in debt portfolio Slice Thirteen, which served as collateral for IITA's $10,000,000 loan to ARS, had yielded collections of more than $2 million in just four months.  In truth and fact,

$2,000,000 of the purported collections was actually an advance from IPI to ARS to give the false impression that collections were doing well.

18 U.S.C. § 1349
18 U.S.C. § 2

## FORFEITURE

The United States Attorney for the District of Maryland further charges that:

1.      Pursuant to 18 U.S.C. Section 981(a)(1)(C) and 28 U.S.C. Section 2461(c), upon conviction of an offense in violation of 18 U.S.C. § 1349 as alleged in Count One, the defendant shall forfeit to the United States of America all property, real and personal, which constitutes and is derived from proceeds traceable to the scheme to defraud.

2.      The property to be forfeited includes, but is not limited to, the following:

  a.      A sum of money equal to the value of the proceeds of the scheme to defraud which amount is at least $145,000,000.

3.      If any of the property described above, as a result of any act or omission of the defendants:

  a.      cannot be located upon the exercise of due diligence;
  b.      has been transferred or sold to, or deposited with, a third party;
  c.      has been placed beyond the jurisdiction of the court;
  d.      has been substantially diminished in value; or
  e.      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 1956(c)(7); 18 U.S.C. § 1961(1); 28 U.S.C. § 2461(c); Rule 32.2(a), F.R.Crim.P.

9/14/12
_____
Date:

Rod J. Rosenstein
United States Attorney for the
District of Maryland

9